In the

# United States Court of Appeals
### For the Seventh Circuit

No. 04-4190

WALID ELKHATIB,

*Plaintiff-Appellant,*

*v.*

DUNKIN DONUTS, INC.,
a Delaware Corp., and
ALLIED DOMECQ,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 8131—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED OCTOBER 30, 2006—DECIDED JULY 10, 2007

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Plaintiff-Appellant Walid Elkhatib is a Palestinian Arab of the Muslim faith who is a U.S. citizen. In 1979, he purchased his first Dunkin Donuts franchise, and has continuously operated various Dunkin Donuts franchises since that time. Elkhatib attested that he chose to pursue the franchise opportunity with Dunkin Donuts in part because it would not require him to handle pork products, which he asserts is forbidden to members of the Arab race by tradition and custom. Although no pork products were served at Dunkin Donuts when Elkhatib purchased his first franchise in

1979, that situation changed in 1984 when Dunkin Donuts introduced its breakfast sandwiches, which are croissants with egg and a choice of cheese, bacon, ham or sausage. Elkhatib refused to sell the sandwiches at his store, and District Manager Jeff Zevoral did not object to that decision. In 1995, Elkhatib opened a second franchise in Berkeley, Illinois, and again his refusal to carry pork products was met with no objection from Dunkin Donuts personnel. A year later, Elkhatib began selling breakfast sandwiches without bacon, sausage or ham, at his two locations. Zevoral facilitated those sales, supplying Elkhatib with a sign that stated "Meat Products Not Available." Zevoral also provided another plastic sign to Elkhatib advertising the breakfast sandwiches, which stated "At participating U.S. shops only [sic] Bacon, sausage or ham may not be available at all shops." In 1998, Elkhatib opened a Dunkin Donuts store in Westchester, Illinois.

Elkhatib was approached in 2002 by Gene Liguoritis, Development Manager for Dunkin Donuts, about the possibility of moving his location within Westchester to a more advantageous location at the intersection of two busy roads. Elkhatib pursued that opportunity, and entered into a Letter of Intent to Ground Lease for the new location contingent upon the approval by Dunkin Donuts. That approval was not forthcoming, and in fact, in May 2002, Elkhatib was informed that Dunkin Donuts would not agree to the relocation. Elkhatib met with Dunkin Donuts supervisors Greg Novak and Chuck Cowgill to ascertain the reason for that decision. Near the conclusion of that meeting, the issue of the breakfast sandwiches arose, and Elkhatib informed them that he would continue to sell breakfast sandwiches, but would not sell pork products because he was forbidden to handle pork. No one mentioned at that time that his objection to selling pork was fatal to his future as a franchise owner.

However, on August 12, 2002, Elkhatib received that news via a letter from Dunkin Donuts legal counsel, declaring that although his current franchise agreements would be honored, he could not relocate nor could he renew any of his franchise agreements because of his failure to carry Dunkin Donuts' full breakfast sandwich product line. In November, 2002, Elkhatib filed a complaint against Dunkin Donuts and its parent company Allied Domecq (hereinafter "Dunkin Donuts"), alleging that the refusal to allow him to relocate or to renew his franchises based on his refusal to sell pork products constituted racial discrimination in violation of 42 U.S.C. §§ 1981 and 1982.

Dunkin Donuts sought summary judgment in the district court, arguing that Elkhatib was denied the right to relocate and renew his franchises because of his refusal to carry a full line of Dunkin Donuts products, including pork products, and not due to his race. In granting that motion, the court on its own construed Elkhatib's claim to be one of religious discrimination rather than racial discrimination, based on the court's determination that the restrictions on handling pork are associated with religion rather than race. Neither party argues for affirming on that basis. Instead, Dunkin Donuts argues that the district court properly held in the alternative that Elkhatib had failed to meet his burden in demonstrating racial discrimination. We review *de novo* the district court's grant of summary judgment, construing all facts and all reasonable inferences in the light most favorable to Elkhatib. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003). We will affirm only if the evidence shows that there is no genuine issue as to any material fact and that Dunkin Donuts is entitled to judgment as a matter of law. *Id.*

The complaint was filed under 42 U.S.C. §§ 1981 & 1982, which provide that "all persons . . . shall have the same

right . . . to make and enforce contracts, as is enjoyed by white citizens," that those rights are "protected against impairment by nongovernmental discrimination," and that all citizens "shall have the same right . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Those provisions are inapplicable to religious discrimination, but protect against racial discrimination.

We note initially that the Supreme Court has recognized that the § 1981 protection against racial discrimination applies to discrimination based on a person's status as an Arab. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Elkhatib may prove discrimination under § 1981 either through direct evidence, or through the indirect burden-shifting method discussed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007); *Cerutti*, 349 F.3d at 1060-61.

Elkhatib has presented little in the way of direct evidence relating to his race. Direct evidence is evidence that, if believed, shows discriminatory conduct by the employer without reliance on inference or presumption, such as where there is an admission by an employer that the decision was based on the prohibited animus. *Cerutti*, 349 F.3d at 1061. That may include circumstantial evidence, but such evidence "'must point directly to a discriminatory reason for the employer's action.'" *Id.* at 1061, *quoting Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Elkhatib provides only a statement from his store manager that in November-December 2001, she overheard Greg Novak make what she regarded as an anti-Arab statement at a meeting of franchisees and their managers. With Elkhatib's permission, she reported the comment through the complaint mechanism supplied by Dunkin Donuts, and was told that Novak's boss,

Cowgill, would stop by the store to apologize. Cowgill did visit the store that week, but did not apologize, and the store manager reported that as well. That incident is potentially relevant in determining the motive for the decision not to renew the franchise agreements, although it arguably indicates retaliatory discrimination rather than racial discrimination. *See Humphries*, 474 F.3d at 398 (recognizing that the protections of § 1981 also apply to claims of retaliation). It is so lacking in detail, however, including any indication as to what the statement was, that any thoughts as to its potential relevance are purely speculative. For purposes of this motion, it is enough to note that it does not provide direct evidence that the decision regarding the renewal and relocation of the franchises was based on Elkhatib's race.

In the absence of such direct evidence, he may survive summary judgment through the indirect burden-shifting method of *McDonnell Douglas*. Under that method, he must first establish a *prima facie* case of discrimination by producing evidence which would allow a jury to find that: (1) he belongs to a protected class; (2) he met Dunkin Donuts' legitimate expectations with regard to the franchise agreement; (3) he suffered an adverse action; and (4) similarly-situated non-protected individuals were treated more favorably. Once Elkhatib meets that burden, Dunkin Donuts must provide a legitimate, non-discriminatory reason for its actions. The burden would then shift back to Elkhatib to demonstrate that Dunkin Donuts' actions were merely pretextual.

There is no dispute that Elkhatib belongs to a protected class, nor is there any question that he suffered an adverse action. Dunkin Donuts argues, however, that Elkhatib has failed to establish that he can perform his obligations under the contract because he is unwilling to serve the full line of products, and that there are no

similarly-situated non-protected individuals treated more favorably.

For its first argument, Dunkin Donuts points to the franchise agreement itself, which requires all franchisees to carry Dunkin Donuts' full food product line. Elkhatib's refusal to carry pork products violates that provision, and according to Dunkin Donuts, establishes that he cannot or will not perform his obligations under the contract. Elkhatib responds that Dunkin Donuts has never required its franchisees to carry the full product line despite that language, and in fact that it affirmatively assisted franchisees in carrying less than the full product line by providing signs for stores declaring: "No Meat Products Available."

Dunkin Donuts' decision in the past not to require compliance with that provision would not prevent it from enforcing it in future franchise agreements, as would be the case if Elkhatib relocated or renewed his franchise agreements. Nevertheless, if Dunkin Donuts continued to allow franchisees to carry less than its full product line without consequence or any other indication that the provision was a material part of the contract, then it could hardly point to that neglected provision to defeat a claim of racial discrimination if it chose to enforce it against only certain racial minorities.

In that manner, this is similar to a line of cases in the employment context in which violations of legitimate employer expectations were met with disparate treatment based on race. For instance, in *Curry v. Menard, Inc.*, 270 F.3d 473 (7th Cir. 2001), an African-American cashier acknowledged that she had violated the store's progressive disciplinary policy which provided for termination for the three cash discrepancies in her cashier drawer. She maintained, however, that two non-African-American cashiers with similar violations were not terminated. The

issue, then was whether the employer applied its legitimate employment expectations in a discriminatory manner. We held that "it makes little sense in this context to determine whether she was meeting Menard's legitimate expectations. Rather, Menard's argument is more appropriately considered in our analysis of pretext." *Id.* at 478. We have reiterated that conclusion in subsequent cases, recognizing that "'[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner (i.e., applied expectations to similarly situated . . . younger employees in a more favorable manner), the second and fourth prongs merge—allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002); *Cerutti*, 349 F.3d at 1064 n. 8 (quoting *Peele*).

That same scenario is present here. Elkhatib does not deny that his failure to carry the full line of breakfast products is inconsistent with the requirement in the franchise agreement. He argues, however, that Dunkin Donuts applied that franchise provision in a discriminatory manner. In that context the second and fourth prongs merge in the inquiry. That leads to the issue of whether there were similarly-situated individuals not in the protected class who were treated differently. Of the three franchises in the Chicago area who refused to carry the full line of breakfast sandwiches, none were owned by an Arab. Dunkin Donuts nevertheless argues that they are not similarly-situated because their reasons for refusing to carry the sandwiches were different from Elkhatib's. One of those franchises did not carry breakfast sandwiches at all because its lease prohibited it from serving sandwiches. Another did not carry any breakfast sandwiches because it ostensibly lacked space for the toaster oven or microwave needed to do so. Finally, the

third franchise did not carry any pork products because it sought to meet the demand in the area for a kosher establishment.

The level of similarity that Dunkin Donuts would require in order for the *prima facie* case to be met is unworkable and inconsistent with *McDonnell Douglas*. The similarly-situated requirement should not be applied mechanically or inflexibly, but rather is a common-sense flexible inquiry that seeks to determine whether there are enough common features between the individuals to allow a meaningful comparison. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007). Substantial similarity, not complete identity, is required. *Id.* at 405. In fact, we cautioned in *Humphries* against overly technical or rigid interpretations of this requirement:

> It is important not to lose sight of the common-sense aspect of this inquiry. It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees—distinctions can always be found in particular job duties or performance histories or the nature of the alleged transactions . . . but the fundamental issue remains whether such distinctions are so significant that they render the comparison effectively useless. In other words, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation—recall that the plaintiff need not *prove* anything at this stage.

[citations omitted; italics in original] *Id.*

The franchises identified as comparators were identical in all relevant respects in that they all failed to carry part or all of the breakfast line of products despite the require-

ment in their franchise agreement that they do so. That franchise provision is absolute in its terms, and does not indicate that exceptions would be made for certain reasons and not others. Therefore Dunkin Donuts' argument that their reasons for failing to carry the full product line were different than Elkhatib's is unavailing.

In fact, for at least two of the franchises, the problem arguably could have been resolved if it truly was a concern of Dunkin Donuts. The franchise with the lease prohibition could have relocated to a location without that restriction. Dunkin Donuts did not require that action as a condition of renewing the franchise, and in fact allowed the owner to renew the lease at that location without threat of losing the franchise after the time that it informed Elkhatib that his failure to carry the sandwiches would result in the nonrenewal of his franchise. The original lease issued in 1983 contained the restriction on the sale of sandwiches. In 2003, after the letter was sent to Elkhatib informing him that his franchise would not be renewed for failure to carry meat sandwiches, Dunkin Donuts entered into an agreement extending the lease on that store for an additional 10 years, with no modification of the provision banning the sale of sandwiches.

Similarly, Elkhatib and a co-worker visited the store with the space limitations and attested that the store had ample room for the equipment needed to serve breakfast sandwiches, but chose to use that space to display multiple shelves of coffee instead. The conversion of that space was not required of it by Dunkin Donuts, and it was not threatened with nonrenewal. Moreover, even if Elkhatib were wrong in that assessment, we would not assume that on summary judgment, and it remains that Dunkin Donuts did not require that franchise to either modify its store or relocate in order to maintain the franchise. Finally, although Dunkin Donuts asserts that

the third franchise did not carry pork in acquiescence to customer preferences, it provided no evidence to that effect. In any case, there is no meaningful distinction for purposes of the similarly-situated inquiry between the franchises that refused to carry breakfast sandwiches because of lease and space issues, and Elkhatib.

Because Elkhatib has demonstrated a *prima facie* case, Dunkin Donuts must respond with a legitimate non-discriminatory reason for its actions. Dunkin Donuts points to the franchise provision requiring the full line of products as its non-discriminatory reason. There is enough evidence in the record, however, demonstrating that the reason is pretextual, for Elkhatib to survive summary judgment.

As set forth above, there is significant evidence that the carrying of breakfast sandwiches was not an issue of importance to Dunkin Donuts. It allowed other franchises in the area to refuse to carry any breakfast sandwiches at all, when merely relocating the stores, or in one case merely rearranging the displays, would have allowed them to carry the full line. In contrast, Elkhatib carried the breakfast sandwiches with the exception of the meat products. That was apparently so common that Dunkin Donuts supplied signs for such franchises declaring "Meat Products Not Available." Moreover, despite the failure of Elkhatib to carry pork products for nearly 20 years, his stores received positive reviews and the failure to carry such products was never an issue.

That it was not of importance is strengthened by evidence that breakfast sandwiches accounted for only approximately 4% of sales at all Dunkin Donuts stores. As was mentioned, unlike the other franchises identified by Dunkin Donuts, Elkhatib carried breakfast sandwiches but did not carry the pork products, so part of that 4% would presumably still be realized in his store. In any

case, there is significant evidence that the carrying of breakfast sandwiches generally, and the carrying of meat products specifically, was not a factor that was important to Dunkin Donuts in the franchise decisions, and there is no evidence that there was any change in corporate policy, or even regional policy, on the matter. In fact, the franchise that failed to carry them because of lease restrictions was allowed to renew that lease, and maintain its franchise, after the decision was made to deny renewal of Elkhatib's franchise. The evidence was sufficient to allow a jury to find pretext, and therefore the district court improperly granted summary judgment. The decision of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*
