NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 8, 2012
Decided August 21, 2012

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 11-3198

| | |
|---|---|
| NATALIE NASH,<br>    *Plaintiff-Appellant,*<br><br>    *v.*<br><br>BOARD OF EDUCATION OF DOLTON<br>WEST SCHOOL DISTRICT 148 and<br>JAYNE PURCELL,<br>    *Defendants-Appellees.* | Appeal from the United States District<br>Court for the Northern District of Illinois,<br>Eastern Division.<br><br>No. 09 C 7558<br><br>Ronald A. Guzmán,<br>*Judge.* |

**O R D E R**

Natalie Nash, an African-American, appeals the grant of summary judgment against her in her suit under 42 U.S.C. § 1981 alleging that a school board and its superintendent racially discriminated and retaliated against her by "terminating" her contract. Nash has not provided evidence from which a rational trier of fact could conclude that the decision was unlawfully motivated. Accordingly, we affirm the judgment.

Because we are reviewing a grant of summary judgment, we present the facts and their reasonable inferences in Nash's favor. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012). For the school years spanning 2004–2008, Nash performed community and media relations work for the Dolton West School District 148 under four one-year contracts. Saundra Mickles, the assistant superintendent, negotiated and signed the contracts. She also signed another one-year contract in the summer of 2008 for the upcoming school year, the contract at issue in this case.

At the end of that summer, defendant Jayne Purcell, who is white, replaced an African-American as superintendent, and the board began enforcing a policy that required administrators to obtain board approval for any contract over $10,000. Upon learning about Nash's new contract, the board's business manager directed Mickles to present the contract, which was for $30,000, to the board for approval. Mickles submitted the contract at the board's September meeting.

At that meeting the board's president, who is black, complained about Nash's performance. She said that Nash focused on highlighting bad publicity about the district (including stories about the superintendent's recent untimely retirement) rather than good publicity (like a recent renovation project). The president also wanted the contract to require Nash to take direction from the superintendent.

Purcell met with Nash in October to discuss Nash's contract duties. According to Nash, at the meeting Purcell said the contract was a "done deal" and asked Nash to start planning an event for "parent night," which she did four days after the meeting. Shortly after the meeting, Purcell wrote a memo to the board regarding the meeting, which she described as "very productive." But Purcell also reported that Nash was refusing to work until she was paid her salary for August and September, a matter for which she threatened to retain legal counsel. Purcell recommended paying Nash for August and September and renewing her current contract.

The board did not approve the contract. It discussed Purcell's memo at an October meeting and decided that any further arrangements with Nash were "not going to be . . . successful." The board wrote Nash's attorney to explain its decision, stating that Mickles had merely offered Nash a proposed contract that required board approval, and the board did not approve the contract. It also criticized Nash for being unwilling to continue "negotiations" unless she got paid for the two months before the board voted.

Nash sued Purcell and the school board under 42 U.S.C. § 1981, claiming that they discriminated against her when they "did not honor" her contract and replaced her with a

white person. She also claimed they retaliated against her for "opposing the Board's discriminatory refusal to honor her contract." She added state-law claims for breach of contract and tortious interference with contract.

The defendants moved for summary judgment, which Nash opposed. For her discrimination claim, she argued that Purcell, whose arrival coincided with the board's new policy requiring that it approve contracts, was racially biased against her. Nash cited an affidavit from Maureen White-Rush, who is her sister and was an assistant to Purcell before Purcell was the superintendent. According to White-Rush, Purcell made three racially tinged comments during the time they worked together: (1) she called White-Rush a "black working dog"; (2) she told White-Rush that before Purcell's promotion to Interim Superintendent, "it used to be the four black ladies against the white lady," but after the promotion "the tables have turned"; and (3) she said to White-Rush that Mickles (who is black) was a "worthless piece of crap" who "just need[ed] to go away" for making a speech on racial issues. Nash also submitted an affidavit from Mickles stating that she submitted two contracts from white vendors to the board that did not require their approval. On the retaliation claim, Nash primarily relied on affidavits from White-Rush and Mickles in which they say they were demoted after complaining about racial issues.

The district court granted the motion, concluding that Nash failed to make out either a direct or indirect case of discrimination. Under the direct case, the court dismissed White-Rush's affidavit as hearsay. It then concluded that the board's new policy requiring that it approve contracts, although coinciding with Purcell's arrival as superintendent, is not by itself evidence of discrimination. Under the indirect method of proof, the court concluded that Nash presented no evidence that a similarly situated person of another race had been treated more favorably. Finally, regarding the retaliation claims, the court reasoned that although others may have accused Purcell of discrimination and were then demoted, no evidence suggests that Nash herself opposed discrimination before her contract was denied.

On appeal Nash argues that the district court erred in concluding that the jury could not reasonably find that the board "terminated her contract" because of her race. Invoking both the direct and indirect methods of proof, she focuses on four parts of the record: (1) White-Rush's affidavit chronicling Purcell's past racial comments; (2) Mickles's affidavit stating that she submitted two contracts from white vendors but was not required to obtain the board's approval; (3) the "suspicious timing" of Purcell's promotion to Superintendent around the same time that the board began enforcing the policy of requiring approval of contracts over $10,000; and (4) the board's "inconsistent reasons" for not contracting with her (first, it criticized her performance, then later it attacked her unwillingness to negotiate), which she says are "pretexts" for discrimination.

This evidence does not permit a reasonable inference that the board declined to renew Nash's contract because of her race. We analyze claims under 42 U.S.C. § 1981 with the same substantive standards and methods of proof as those that apply to claims brought under Title VII. *See Smith,* 681 F.3d at 896. Under the direct method of proof, the plaintiff's evidence "must point directly to a discriminatory reason for the employer's action and be directly related to the employment decision." *Dass v. Chi. Bd. of Educ.,* 675 F.3d 1060, 1071 (7th Cir. 2012) (internal quotations and citations omitted). Nash argues that she has direct evidence—Purcell's racial comments—which she argues are not hearsay.

Nash is correct that the district court mistakenly disregarded the comments as hearsay. The court apparently assumed that Nash offered to testify about what White-Rush said Purcell had said. In fact, Nash offered an affidavit from White-Rush herself. A party may rely on an affidavit at summary judgment if it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4); *see Luster v. Ill. Dep't of Corr.,* 652 F.3d 726, 731 & n.2 (7th Cir. 2011). White-Rush heard Purcell make the comments, and Purcell's comments are not hearsay because they were not offered for their truth, but rather to show that Purcell made them. *See* FED. R. EVID. 801(c); *United States v. White,* 639 F.3d 331, 337–38 (7th Cir. 2011).

Nonetheless, Purcell's comments are not evidence of racial hostility toward Nash because they were not about Nash, they were not made near the time of any adverse employment actions against Nash, and did not reference any adverse employment actions. *See Overly v. Keybank Nat'l Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011); *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781–82 (7th Cir. 2007); *Merillat v. Metal Spinners, Inc.,* 470 F.3d 685, 694 (7th Cir. 2006). In fact, the *only* evidence in the record about Purcell's attitude toward Nash shows that Purcell *supported* Nash. The letter she wrote to the board shows that she wanted to pay Nash for the first two months of the contract *and* retain her; it was the board that chose to end the relationship, yet nothing in the record suggests that the board harbors any racial bias.

The other circumstantial evidence that Nash relies on for her direct case is equally unavailing. White-Rush testified that she submitted contracts for over $10,000 from two white vendors and was not asked to submit them to the board for approval. But she also explained in her deposition testimony that those two contracts were "done" before the September meeting, when the policy was first enforced. Nash then revives her accusation that Purcell's arrival suspiciously coincided with the board's newly enforced policy requiring that it approve contracts over $10,000. But even if it is reasonable to infer that

Purcell wanted the policy enforced, nothing suggests that she wanted it enforced because she was racially hostile to Nash.

Nash does not address her discrimination claim under the indirect method of proof until her reply brief, where she attempts to identify a similarly situated white person who was treated more favorably than her. She points to Mickles's deposition testimony that after the board ended the relationship with Nash, the board hired a white woman to do "basically the same thing" as Nash had been doing. But to make out a prima facie case under the indirect method, Nash must put forward evidence that she was meeting the legitimate expectations of her employer. *Smith v. Sebelius*, 2012 U.S. App. LEXIS 12428, at *10 (7th Cir. June 19, 2012); *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012). Not only has she failed to offer such evidence, the record is to the contrary: The board was not happy with Nash's performance because she focused on negative stories. Nash replies that the board later accused her of also being unwilling to negotiate. *That* accusation, Nash insists, is inconsistent with performance problems, and therefore shows that both reasons are pretexts. But both reasons are compatible grounds for believing that she was not meeting the board's legitimate expectations and for ending her contract. The first reason referred to her past work and the second related to her current behavior. Without a prima facie case, Nash's indirect case collapses.

Nash also argues that the district court erred in granting summary judgment on her retaliation claim, but she is wrong. Section 1981 authorizes claims for retaliation, but only if the defendant took adverse action against another for asserting a right protected by § 1981. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008); *see Bray*, 681 F.3d at 896. Nash does not even assert, let alone have evidence tending to prove, that the board took action against her because she asserted her or anyone else's right to be free of discrimination in making contracts. And in fact, Nash testified that she did not complain about discrimination until *after* the board had already decided to not honor the contract, the only adverse employment action she says she faced. So the decision not to renew her contract could not have been retaliatory. *See Bray*, 681 F.3d at 896; *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).

AFFIRMED.